Robert STUNDON, Appellant
(Plaintiff below),

v.

L. J. STADNIK, Appellee
(Defendant below).

No. 3730.

Supreme Court of Wyoming.

May 15, 1970.

Lynn Rees, Laramie, for appellant.

Peter J. Mulvaney of Guy, Williams, White & Mulvaney, Cheyenne, for appellee.

Before GRAY, C. J., and McINTYRE, PARKER, and McEWAN, JJ.

Mr. Justice McEWAN delivered the opinion of the court.

Plaintiff was operated upon twice by the defendant for the removal of cataractous lenses from his eyes. During the second operation on January 8, 1962, which concerned the left eye, some fluid vitreous was lost from the eye. Some months following the second operation, plaintiff suffered a detached retina and subsequently lost vision in the left eye.[1] The left eye was removed January 16, 1967.[2] Plaintiff filed suit September 16, 1966, and the cause was tried before a jury on May 6, 1968. At the close of plaintiff's case, defendant's motion for a directed verdict was granted, and plaintiff appeals.

The plaintiff's pleadings and arguments are rather difficult to follow and will, therefore, be set out in full so that those interested in the opinion may have some idea of the task of the court in analyzing the points raised by the appellant in this appeal.

In his original complaint, plaintiff, in utter disregard of Rule 10(b), W.R.C.P., but which was not attacked by the defendant, sets out what is called three causes of action[3] against defendant and prays for judgment against the defendant for the sum of $154,000. The first cause of action alleged different counts of malpractice as follows:

1. Negligence in the cataract extraction operation on his left eye which resulted in the loss of the sight in plaintiff's left eye;

2. Fraudulent concealment of the negligence in the operation, and also in the postoperative treatment of the left eye, including the advice and treatment that were given later when the retina became detached from the left eye; and

3. Negligence in the postoperative treatment after the retinal detachment occurred concerning the failure to advise regarding the removal of the eye which resulted in a great deal of unnecessary pain and suffering by the plaintiff until the time it was discovered.

The second cause of action alleged malpractice in defendant's failure to fully inform plaintiff of his negligence in the operation and his fraudulent concealment of this negligence resulting in the loss of sight of the left eye, with the further allegation that if plaintiff had been informed of the dangers and risks inherent in such an operation he would not have consented to it.

The third cause of action alleged a contract guaranteeing the successful performance of the operation and the breach of the same. This third cause of action was dismissed by the court on a motion for summary judgment by defendant but the point has not been argued and hence will be considered as having been waived.

The answer of defendant admitted performance of the operation but denied any and all allegations of negligence, malpractice and fraudulent concealment.

Plaintiff's pretrial memorandum elaborated on what is claimed to be the several acts of negligence charged to the defendant.

Defendant in general denied all of these allegations of plaintiff and alleged that the operation was performed in the medically approved manner; that plaintiff had been sufficiently informed; that plaintiff was

1. The doctor's records show that the retinal detachment occurred September 15, 1962 while the plaintiff testified that the retinal detachment occurred about November 22, 1962.

2. The left eye was removed after suit was filed but before the case was tried.

3. See 5 Wright and Miller, Federal Practice and Procedure, § 1324, p. 466 (1969).

well aware of the risks involved, prior to the operation, because of the previous cataract extraction on his right eye, and denied that there was any guaranty made to plaintiff concerning the results of the operation; and defendant also moved to amend his answer to include the defense of contributory negligence, to which plaintiff filed a denial of any contributory negligence.

At the close of plaintiff's case, the trial court granted defendant's motion for a directed verdict.

### Rulings, Orders and Judgment Sought to be Reviewed

Plaintiff makes the following contentions concerning errors committed at the trial of the case which he feels warrant the reversal of the judgment of trial court and in ordering a new trial thereof:

1. That the trial court erred in sustaining the objection when the plaintiff was asked if he had known that the doctor had difficulty in extracting the lens in plaintiff's first operation, would such knowledge have made any difference as to plaintiff's consenting to the second operation;

2. The trial court should not have sustained defendant's objection to plaintiff's testimony concerning what plaintiff heard spoken in the operating room during the operation;

3. That the trial court erred when it stated that the evidence of duty to warn a patient "depends upon the circumstances of the case and upon the general practice followed by the medical practititioners [sic] in the locality and the custom of the medical practice must be established by expert medical testimony. * * * *";[4] and

4. That the trial court erred in granting defendant's motion for a directed verdict for the following reasons:

"a. The motion did not meet the requirements of either Rule 41(b)(1) or Rule 50(a) of the Wyoming Rules of Civil Procedure.

"b. There was sufficient evidence to make out a showing of negligkence [sic] in the operation on Plaintiff's left eye to make out a case of inference of negligence whereby the doctrine of Res Ipsa Loquitur should have been used to submit the case to the jury, including proximate cause.

"c. There was sufficient evidence of malpractice in the treatment of Plaintiff by Defendant at the time of the retinal detachment of Plaintiff's left eye and after, including proximate cause.

"d. There was sufficient evidence of malpractice in Defendant's treatment of Plaintiff after the loss of sight in Plaintiff's left eye concerning the failure to advise and recommend the removal of the eye, including proximate cause.

"e. There was sufficient evidence of fraudulent concealment by Defendant amounting to malpractice.

"f. There was sufficient evidence of failure to disclose risks and facts amounting to malpractice as violation of Defendant's duty to warn and disclose everything to Plaintiff, his patient."

Appellee argues:

1. It is necessary for plaintiff to prove by the evidence of competent experts that the injury complained of was caused by defendant's negligence;

2. The custom of the medical profession to warn a patient of the possible risks which may result from a proposed treatment must be established by expert medical testimony; ·

3. The theory of res ipsa loquitur is not applicable in a case such as was before the court on the trial of this matter; and,

4. Plaintiff failed to carry his burden of proof that some conduct of defendant proximately caused the injury of which plaintiff complained.

We believe that the trial court was correct in granting defendant's motion for

---

4. This statement was made by the trial court to the jury when directing the verdict.

a directed verdict. Plaintiff failed to show any causal connection between defendant's alleged negligent acts and the plaintiff's injury. Proof of proximate causation is upon the plaintiff. Lemos v. Madden, 28 Wyo. 1, 200 P. 791, 794; Shetter v. Rochelle, 2 Ariz.App. 358, 409 P.2d 74, 83; Woods v. Brumlop, 71 N.M. 221, 377 P.2d 520, 522.

Plaintiff's witnesses were the plaintiff, his wife, and Robert Jessen, a physician licensed to practice in Wyoming, specializing in ophthalmology.

### Arguments (1), (3) and (4)f

These three plaintiff's assigned errors are similar and will be considered together.

Plaintiff contends that he did not give an informed consent to the operation on his left eye because the defendant failed to properly inform and advise him about the risks of the operation, and failed to advise the plaintiff that he had difficulty in extracting the lens in the first operation.

Questions asked of the plaintiff on direct examination and his answers, and the objection of the defendant were as follows:

"Q. At the time you went to the hospital for the second operation, the one on your left eye, had Dr. Stadnik said anything at all concerning any difficulty in the operation on the right eye? A. No. Absolutely not, because he was so pleased, everybody was so pleased. He never mentioned that there was no difficulty in the operation.

"Q. Did he ever say anything up to this time concerning having a difficult time extracting the lens? A. No, absolutely not. In fact, we never discussed the operation. It was never mentioned. It was a success, so I just—we never mentioned it. He never said it was a hard time taking it off or nothing.

"Q. Now, had you known that he had had difficulty extracting the lens in your first operation would this have made any difference as to your consenting to the second operation?

"MR. MULVANEY [attorney for defendant]: Objection on the grounds the witness testified that he had no such knowledge.

"THE COURT: I will sustain the objection."

Appellant has cited no authority in support of his position that this ruling of the trial court was erroneous. It is obvious that the plaintiff would have answered the objectionable question in the affirmative. There is nothing in the record to indicate that the defendant had in fact had a difficult time extracting the lens during the first operation, so the question assumes facts which are not in evidence and the objection to it was properly sustained. Plaintiff argues that certain hospital records show that the defendant had a difficult time extracting the lens during the first operation. While this is true, the records were not offered or received into evidence until after the plaintiff completed his testimony. No attempt was made to again ask the question of the plaintiff after the exhibit was received.

As to how plaintiff's knowledge that defendant had difficulty in extracting the lens in the first operation would have had an effect upon plaintiff's decision whether to have the second operation we are not advised. As to the first operation, the plaintiff testified that he had "just a little" pain the same day of the operation, and none after that, that he had no difficulty after he left the hospital and "it was just wonderful," and that it was a "beautiful job." It thus appears that the first operation, being the one on plaintiff's right eye, was successful and plaintiff was pleased with the outcome.

Plaintiff further testified that the night before the first operation, which was for removal of a cataract on plaintiff's right eye, the doctor sat down and told him "* * * it was merely a simple operation and explained how it was done, how the anesthetic was given and told me to just forget it because it was routine with him, nothing to worry about."

The plaintiff does not contend that the operation on the left eye, which is the basis of the law suit, was any different from the operation on the right eye. Since the defendant "explained how it was done," and the plaintiff fails to contend that he was not correctly or properly informed, we must conclude that plaintiff was properly informed.

Plaintiff has not pointed out to us wherein defendant failed in the claimed duty to fully inform plaintiff of the details of the operation and apparently directs his argument in this regard to the claim that he was not advised of the risks of the operation.

As we said in Govin v. Hunter, Wyo., 374 P.2d 421, 424:

"Whether or not a surgeon is under a duty to warn a patient of the possibility of a specific adverse result of a proposed treatment depends upon the circumstances of the particular case and upon the general practice followed by the medical profession in the locality; and the custom of the medical profession to warn must be established by expert medical testimony. * * *"

■ The existence of a standard to disclose must be proved by expert medical testimony, and the plaintiff made no attempt to show that there was a standard to disclose.

### Argument (2)

■ The plaintiff contends in his second argument that the trial court erred in sustaining defendant's objection to plaintiff's testimony concerning what the plaintiff heard spoken in the operating room while the operation was being performed. The plaintiff alleged, and according to his offer of proof would have testified, that during the operation on his left eye he was not tied down and that he heard, during the operation, a male voice, being that of either the defendant or the assistant surgeon, say "Look out, you're going to cut him." There was no showing that the plaintiff was in fact "cut," but even assuming that the plaintiff was cut, there was no showing of any causal connection between being "cut" and the injury of which plaintiff complains.

There was no competent or expert evidence, or indeed any evidence of any kind, that there was any relationship between these alleged negligent acts and plaintiff's loss of vision. No proper question could have been put to the jury because the question of causal effect was left open to mere conjecture.

### Argument (4)a

■ The plaintiff contends that the trial court should not have granted defendant's motion for a directed verdict under Rule 50(a) because the motion did not state specific grounds. In his motion the defendant stated as his basis that the plaintiff had failed in his burden to show by competent testimony that the defendant was negligent in the performance of the operation or in postoperative care, or in the giving or not giving of advice. Argument was had by counsel following which the trial court made a lengthy, cogent statement to the jury. There is no merit in plaintiff's contention because the specific grounds were stated and explained by virtue of describing the manner by which plaintiff had failed to meet his burden and establish his case. Brown v. Sievers, Wyo., 410 P.2d 574.

### Argument (4)b

Plaintiff contends that there was sufficient evidence to make out a case of inference of negligence whereby the trial court should have submitted the case to the jury on the theory of res ipsa loquitur.

Plaintiff submits that the sequence of events from the short period of time from the operation until plaintiff went blind can lead to no other conclusion than that defendant's negligence in the operation resulted in the loss of vision in plaintiff's left eye. Appellee concedes that there are certain medical malpractice cases in which the theory of res ipsa loquitur may be applicable.

The case of Ewing v. Goode, S.D.Ohio, 78 F. 442, 443, was a malpractice action arising out of the removal of a cataract and was decided in 1897. Even though the case was decided 73 years ago, a pronouncement made therein is most appropriate to the case at hand:

"* * * The naked facts that defendant performed operations upon her eye, and that pain followed, and that subsequently the eye was in such a bad condition that it had to be extracted, establish neither the neglect and unskillfulness of the treatment, nor the causal connection between it and the unfortunate event. A physican is not a warrantor of cures. If the maxim, 'Res ipsa loquitur,' were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.'"

■ The application of the doctrine is allowed where the act or admission was negligent within the common knowledge of man, but the doctrine will not be applied where the determination of the alleged negligence is not within the common knowledge of man, and the plaintiff must then establish and prove the lack of requisite care and skill by expert testimony. Schofield v. Idaho Falls Latter Day Saints Hospital, 90 Idaho 186, 409 P.2d 107, 109.

■ The basis for departing from the normal rule that a standard of care must be provided by expert medical testimony arises where asserted negligence consists of conduct so obviously wanting in reasonable medical skill and prudence that it may be so adjudged even by laymen. Wright v. Conway, 34 Wyo. 1, 241 P. 369; Renrick v. Newark, 74 N.J.Super. 200, 181 A.2d 25, 82 A.L.R.2d 1262.

■ The doctrine of res ipsa loquitur is not applicable in malpractice actions in which the only proof is the fact that the treatment of the patient terminated with poor results. DiFilippo v. Preston, 53 Del. (3 Storey) 539, 173 A.2d 333, 339.

■ The doctrine cannot be applied in a malpractice action arising out of surgery in absence of a causal nexus between an unfortunate result and the act of surgery. Hale v. Heninger, 87 Idaho 414, 393 P.2d 718, 723; Gerhardt v. Fresno Medical Group, 217 Cal.App.2d 353, 31 Cal.Rptr. 633, 636. Here there was no showing of any causal connection between the operation performed by the defendant and the plaintiff's loss of sight.

Here the plaintiff seems to contend that loss of the eye resulted from the retinal detachment. Plaintiff makes great moment of the loss of vitreous fluid, but makes no showing that there was any connection between the loss of fluid and the detached retina. Here the jury would have to have found that loss of fluid was caused by an obvious wanting in medical skill; that loss of fluid was related to the retinal detachment, and the detachment caused the loss of sight. This the jury could not do.

■ The trial court was correct in its ruling. The facts do not warrant the application of the doctrine.

### Argument (4)c

Plaintiff contends that "There was sufficient evidence of malpractice in the treatment of Plaintiff by Defendant at the time of the retinal detachment of Plaintiff's left eye and after, including proximate cause." Plaintiff testified that at about noon on a Saturday in November 1962 he was working and he began to get colored flashes out of the corner of his left eye. He kept working for awhile, but finally went home hoping that if he sat down and relaxed the flashes would go away. They did not and he called the defendant at about 8 p. m. The doctor instructed the plaintiff to meet him right away at the office. According to his testimony the doctor told him at that time that he had a "fallen retina." The plaintiff further testified "I knew a little about a retina, so

I asked him, 'Shall I go to Denver?' " According to the plaintiff the doctor said "No, Bob. I don't think it would do you any good, because you're going to waste your time and money, because you've got what they call a bad eye there. It's sick, sore, and you'd be wasting your time and money." The defendant's records, admitted as one of plaintiff's exhibits, notes that the defendant saw the plaintiff at 7:30 p. m. on September 15, 1962, at the doctor's office. This record states "Flashes this A.M. Retinal detachment above. * * * Advised surgery in Denver, recommended with poor prognosis. * * *"

The plaintiff contends that the defendant told him not to go to Denver for surgery, while the defendant's records indicate that the defendant advised the plaintiff to go to Denver for surgery.

The plaintiff's witness, Dr. Jessen, testified that when vitreous fluid loss occurs, "There may be an increase in the likelihood of glaucoma, a possibility of the pupil being displaced." There was no showing of any relationship between glaucoma and retinal detachment nor the significance of the pupil being displaced, and there was no attempt to make this testimony relate to the case at hand. He further testified that the custom in Laramie, Wyoming, when a retinal detachment occurs is to refer the patient to a detachment center or a detachment specialist, a surgeon. The plaintiff's expert witness did not testify that he referred all cases of retinal detachment to a detachment center or detachment specialist. He was not asked if the custom was the same for a "bad eye" that was "sick, sore" as testified to by the plaintiff.

It may be that even if the plaintiff's eye was a "bad eye" that was "sick, sore" the general practice followed by the medical profession would be to refer the plaintiff to a specialist. However, the plaintiff testified that the defendant told him that reattachment surgery would do no good. If the defendant so advised the plaintiff, it would have been the judgment of a physician, and expert testimony would be required to show that the defendant was in error and in some manner negligent in giving such advice.

There was offered into evidence a report entitled "Examination of Pathological Specimen" made by Masahiro Sakai, M.D., concerning the pathologist's examination of plaintiff's left eye after it was removed by Dr. Jessen. This report could perhaps have been the basis of testimony by Dr. Jessen as to the cause of the retinal detachment and the possibility of successful reattachment surgery. But no attempt was made to have Dr. Jessen testify as to the plaintiff's particular case. The jury would have had to speculate as to whether or not the plaintiff's particular case would have lent itself to reattachment surgery.

█ In ruling on the correctness of the trial court's directing a verdict, we have considered all of the plaintiff's evidence in its most favorable light and conclude that there is no showing that there was a reasonable expectation that the retinal reattachment surgery would have been successful had it been undertaken. Woods v. Brumlop, 71 N.M. 221, 377 P.2d 520, 522.

### Argument (4)d

Plaintiff showed by expert testimony that if the left eye was in the same condition and with the same complaints of pain in December of 1962, as it was in April of 1966, this doctor would have, in December of 1962, recommended that the eye be removed. There was no showing that the eye was in the same condition in 1962 as it was in 1966, and thus it would again have been mere conjecture on the part of the jury to find that the defendant should have recommended in December of 1962 that plaintiff have the eye removed and thus save the plaintiff the pain and suffering from December of 1962 to April of 1966. It is interesting to note that the plaintiff first saw Dr. Jessen April 9, 1966, at which time it was recommended to plaintiff that the eye be removed, and yet the plaintiff did not have the eye removed until January 16, 1967, or nine months later.

### Argument (4)e

Plaintiff contends in his argument (4)e that defendant's failure to mention that he had difficulty in the first operation, and, defendant's failure to mention loss of vitreous fluid during the second operation and the possible complications, all give rise to an inference of negligence by willful concealment which amounts to malpractice.

We have previously considered the appellant's contentions concerning the first operation and further discussion is unnecessary.

There was no showing by the plaintiff that there was any causal connection between the loss of vitreous fluid and the plaintiff's subsequent loss of vision. The only testimony touching upon this point was given by plaintiff's witness Dr. Jessen. He was asked upon direct examination " * * * whether or not the loss of vitreous in a cataract extraction operation is a usual or unusual event?" The doctor answered "Well, it occurs with fair frequency." He further testified "Well, without statistical evidence, from my own experience, probably one in perhaps fifteen cases—one in twenty, somewhere in there." This is the extent of the testimony or evidence touching upon the loss of vitreous fluid.

While it may be that there is some causal connection between the loss of vitreous fluid and a detached retina, there was no such showing by expert testimony, and thus the jury could not have so found since such knowledge is not common to laymen.

If there is a causal connection between loss of vitreous fluid and a detached retina, such fact is so far removed from the usual and ordinary experience of the average man that expert knowledge is essential to the formation of an opinion and the matter could not, in the present case, have been considered by the jury.

Since there was no showing of causal connection between loss of vitreous fluid, the detached retina, loss of vision, pain, and subsequent removal of the eye, it would be immaterial whether or not the defendant advised the plaintiff of the loss of vitreous fluid.

A careful review of the evidence, taking as true all of the facts from plaintiff's evidence and all reasonable inferences therefrom, convinces us that the trial court was correct in granting defendant's motion for a directed verdict.

Affirmed.